Richard Spencer
734 Clearwater Dr.
Whitefish, MT 59937

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

| | |
|---|---|
| ELIZABETH SINES *et al.*, | Case No: 3:17-cv-00072-NKM |
| Plaintiffs | |
| vs. | **INFORMAL BRIEF** |
| RICHARD SPENCER, | |
| Defendant | |

Comes now the Informal Brief of Defendant Mr. Richard Spencer in his appeal of *Sines v. Kessler*.

**Issue 1: Denial of Change of Venue Motion**

If any trial were deserving of a change of venue, it was this one. This case involved a political protest ("Unite The Right" of August 2017), that was highly controversial and hotly debated even before it took place; since August 2017, the rally has become synonymous with the city of Charlottesville itself. The death of a counter-protester and prominent member of the community, Heather Heyer, and other tragic and disturbing events made emotions surrounding the case intense to say the least. It is true that most Americans who closely follow the news might have heard about the UTR protest, and perhaps formed opinions on it; citizens in the

INFORMAL BRIEF - 1

environs of city of Charlottesville, however, were directly affected by it. The status of Mr. Spencer's co-defendent Jason Kessler, who resided in Charlottesville before and after the UTR rally and was controversial in the community, only added to the inappropriateness of holding the trial in the city.

**Issue 2: The Striking of Mr. Spencer's Motion for Summary Judgement**

Mr. Spencer made an untimely filing of his Motion for Summary Judgement (MSJ) on October 19, 2022, more than a year before the trial began. With a trial first scheduled for the fall of 2020, Judge Hoppe set a deadline of August 7, 2020, for Defendants to deliver their MSJ. That June, Mr. Spencer's attorney withdrew from the process, and did so without filing or drafting a MSJ. With the trial delayed until April 2021 due to the COVID-19 pandemic—and subsequently delayed again until October 2021—Mr. Spencer took up the task of researching and drafting a MSJ as a *pro se* litigant. The Plaintiffs and the Court had ample time to respond to and decide on the matter. On September 14, 2020, in a status conference call before Judge Moon, Mr. Spencer (along with other Defendants) clearly voiced his desire to file a MSJ and requested a "reasonable deadline." Presumably, the Court was inclined to allow new MSJ to be filed, otherwise the topic would not have been broached; however, Mr. Spencer failed to adequately request that these deadlines be set, and filed his MSJ a month after that deadline had passed. Two issues emerge: First, as he wrote in an apology to the Court, "Mr. Spencer's tardiness [has] not done serious or irreparable harm to the process." The Plaintiffs and Court had more than a year to respond. And due to the Covid-19 pandemic, few trials were taking place. Secondly, after the summer of 2020, Mr. Spencer was operating as a *pro se* litigant. He thus should have been granted a certain charity

INFORMAL BRIEF - 2

and leeway—with the condition that he takes his responsibilities seriously and is not, in a bad-faith manner, attempting to delay justice. His MSJ brought up serious legal and Constitutional issues for the Court, and Mr. Spencer incorporates these arguments in his appeal. These were not properly considered by the Court, denying Mr. Spencer a fair trial. See *Wells Fargo Bank v. Jenkins*, 2021 U.S. Dist. LEXIS 250984 (E.D. Va. 2021); *United States v. Mraz*, 274 F. Supp. 2d 750 (D. Md. 2003; and *Canady v. Erbe Elektromedizin GmbH*, 307 F. Supp. 2d 2 (D.D.C. 2004).

**Issue 3: Claim IV Was Wrongly Decided and Contradicted Testimony**

Claim IV involves the Friday-night torch rally and relies on Virginia Code §8.01-42.1. Critically, Claim IV is not a conspiracy charge. Virginia Code §8.01-42.1 addresses direct, racially motivated violence and vandalism. The Court observed that the August 11 torchlight march becomes actionable when it is *combined* with the violent activity that took place surrounding the Jefferson Statue. Otherwise, the march itself amounts to constitutionally protected speech.

During trial, Mr. Spencer questioned Plaintiffs Romero and Willis on the stand. They both claimed to have known about or read about Mr. Spencer before UTR. They thus likely could have recognized him on the night of the march, and surely would have remembered him if he had ever "gotten up close and personal." Yet both Plaintiffs were at the very most vague and noncommittal about seeing Mr. Spencer on the night of August 11, 2017.

From Mr. Spencer's cross-examination of Plaintiff Romero:

> Mr. Spencer: You attended the torchlight rally on August 11th. Did you at any point see me during those activities?

INFORMAL BRIEF - 3

> Ms. Romero: I don't remember who I really saw. Like, if I saw pictures of people, maybe I could, you know, but —
>
> Mr. Spencer: Well, I understand that, but you seem to at least have a pretty good familiarity with what I look like. Did you see me at all during that torch rally?
>
> Ms. Romero: What were you wearing that night?
>
> Mr. Spencer: I was wearing a blue shirt.
>
> Ms. Romero: If you showed me, like, maybe what you looked like, I could…
>
> Mr. Spencer: Well, I'm right here.
>
> (Romero — Cross, p. 88)

From Mr. Spencer's cross-examination of Plaintiff Willis:

> Mr. Spencer: [B]eing that I'm here now, so you can recognize me -- I look more or less like I did then -- did you recall seeing me?
>
> Mr. Willis: My memory is not that strong. I couldn't tell you if you were one of the hundreds of faces, you know.
>
> (Willis — Cross, p. 73)

Plaintiffs Sines is not included in Claim IV, but her testimony is relevant. Ms. Sines remembered being near Mr. Spencer on the night of August 11:

> Mr. Spencer: [D]id I physically confront you at all on August 11th when we were around 10 feet apart?
>
> Ms. Sinese: No, you did not.
>
> Mr. Spencer: Did I yell invectives at you or anything like that while we were 10 feet apart?
>
> Ms. Sines: No, you did not.
>
> Mr. Spencer: On August 12th did we encounter each other in any way?
>
> Ms. Sines: No. I do not recall seeing you on August 12th.

Again, Claim III is not a conspiracy charge. Thus, Mr. Spencer must have directly harmed the Plaintiffs, or expressly ordered someone to harm them, for Virginia Code § 8.01-42.1 to be operative. No evidence was presented at trial that suggested either of those possibilities. In

INFORMAL BRIEF - 4

fact, the Plaintiffs testified to the contrary. Mr. Spencer finds himself in the unenviable position of being found liable for actions that the Plaintiffs testified he did not do.

**Issue 4: Plaintiffs Who Are Not African-American Cannot Properly Allege a Section 1985(3) Conspiracy**

Of the ten plaintiffs in this case, six were not African-American, including lead Plaintiff Elizabeth Sines. This is important because it is at odds with established law regarding Section 1985(3), and sets a precedent that profoundly enlarges the scope of Section 1985(3) and the Thirteenth Amendment. To state a claim under Section 1985(3), a plaintiff must prove the following: (1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy. *Simmons v. Poe,* 47 F.3d 1370, 1376 (4th Cir.1995). The Court maintained that the plaintiffs' allegations met the required pleading standards for the second element above, i.e., racial or class-based animus, as to all the plaintiffs, including those who are not African-American. Given the Supreme Court's and Fourth Circuit's narrow circumscription of Section 1985(3) claims in cases such as *United Brotherhood of Carpenters v. Scott*, 463 U.S. 825 (1983), *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993), and *Harrison v. KVAT Food Management, Inc.,* 766 F.2d 155 (4th Cir. 1985), this holding, Spencer submits, was inconsistent with the controlling precedents. The plaintiffs' Section 1985(3) claim stands or falls on whether they can properly

INFORMAL BRIEF - 5

invoke the Thirteenth Amendment.  The plaintiffs who are not African-American cannot do so.  Imparting rights under the Thirteenth Amendment to plaintiffs who are not African-American would strain that amendment beyond recognition.

**Issue 5: Plaintiffs' Allegations Did Not Satisfy the Required Pleading Standards**

The Supreme Court in its *Twombly / Iqbal* cases has emphasized the importance of taking context into account in determining whether a complaint states a plausible claim for relief.  *See, e.g., Ashcroft v. Iqbal*, 556 U.S. 662, 665 (2009).  So too has the Fourth Circuit.  *See, e.g., A Society Without a Name v. Virginia*, 655 F.3d 342, 347 (4th Cir. 2011).  Four aspects of the context in which the allegations in the plaintiffs' amended complaint must be placed and tested to determine if they meet the *Twombly / Iqbal* plausibility standard merit emphasis, particularly with respect to defendant Spencer.

First, bracketing out for the moment the violent confrontations that occurred, defendants were engaged in classic protected First Amendment activity. Had no violence erupted, there would be no issue of actionable conduct by the defendants. Second, the defendants' rallies and marches involved numerous different groups, hundreds of people, and several different venues over two days.  Obviously, coordinating this many groups, people, and venues required substantial planning, organization, and direction.  Again, there was nothing inherently actionable about this planning, organization, and direction. Third, large numbers of counterprotestors came to the August 11 and 12 events. The plaintiffs were not simply peaceably attending to other

INFORMAL BRIEF - 6

matters at the venues when the defendants burst upon them; the plaintiffs were there because they were engaged in a counter-protest. And it is obvious as well that they did so prepared and with plans to confront the defendants. The August 11 torchlight rally was intended by its organizers to be kept secret from the plaintiffs and other counterprotestors. The pro-monument protestors were not seeking confrontation, but it happened, because the counterprotestors directed their energies into finding out about the torchlight rally, traveling to it, and confronting their perceived political enemies by locking arms around the Jefferson statue. Natalie Romero and Devin Willis *chose* to be at the Jefferson statue and exercise their own First Amendment rights as counter protestors, as the Plaintiffs themselves articulated in their Opening Statement,

> On August 11th, Natalie and Devin were at a spaghetti dinner at the home of one of their professors when they learned that white nationalists were planning to march through campus that evening. Natalie and Devin drove to campus in a car with a bunch of their friends who had attended the dinner. Their plan was to counter hate and stand up for their own school and their own community.

The Friday-night event was not publicly announced; however, news of it reached the Plaintiffs (apparently leaked or intercepted). Romero and Willis, under their own free will, ensconced themselves around the base of the Jefferson statue on the University of Virginia's campus. No evidence was presented as to a pre-existing plan to surround Willis and Romero, for the Defendants (and the rest of the pro-monument protestors) had no idea that they would be there. The surrounding of Romero and Willis occurred because the two actively placed themselves in the heart of the action. When asked why he gathered with others at the base of the Jefferson statue, Mr. Willis's stated that he wanted to confront the UTR protestors: "[Y]ou guys are well-known for liking statues."

INFORMAL BRIEF - 7

Fourthly, the Supreme Court's instructs in *Twombly* and *Iqbal* that parallel conduct alone does not suggest conspiracy and that where there is an "obvious alternative explanation" for the defendant's alleged conduct that does not entail liability under the plaintiffs' conspiracy theory, the plaintiffs have failed to elevate their claim from merely conceivable to actually plausible. *See A Society Without a Name*, 655 F.3d at 347 (discussing *Twombly* and *Iqbal* standards); *McCleary-Evans v. Maryland Department of Transportation*, 780 F.3d 582, 587-88 (4th Cir. 2015) (same). Applying these principles to the contextual aspects identified above, actions such as attending the August 11 and 12 events, organizing them, and preparing for confrontations with hostile counterprotestors have a benign obvious alternative explanation.

Important as well is the standard by which one alleged conspirator's actions are attributed to an alleged co-conspirator. To support the conclusion that Spencer is liable for the August 12 injuries from Fields' automobile, or from, to take another example, the August 11 mallee involving co-defendent Christopher Cantwell, one must invoke the standard that conspirators are liable for the "reasonably foreseeable acts of their co-conspirators." The reasonably foreseeable standard is far too amorphous to use in a Section 1985(3) case or with regard to Claims III and IV—especially since this case involves sensitive and fundamental First Amendment issues. See *Bray* decision (506 U.S. at 275-76).

MARCH 17, 2023

_____
Richard B. Spencer *Pro Se*

INFORMAL BRIEF - 8

**CERTIFICATE OF SERVICE**

I certify that on MARCH 17, 2023, a true and correct copy of the foregoing was filed electronically with the Fourth Circuit Court of Appeals.

_____
Richard B. Spencer, *Pro Se*

INFORMAL BRIEF - 9